# IN THE SUPREME COURT OF IOWA

No. 09–1473

Filed March 2, 2012

**LISA KRAGNES,** et al.,

  Appellees,

vs.

**CITY OF DES MOINES, IOWA,**

  Appellant.

_____

Appeal from the Iowa District Court for Polk County, Joel D. Novak, Judge.

City and plaintiff seek interlocutory appeal of district court's decision certifying a class and entering judgment in favor of plaintiff class. **AFFIRMED AS MODIFIED AND REMANDED.**

Mark McCormick and Margaret C. Callahan of Belin McCormick, P.C., Des Moines, and Bruce E. Bergman, Des Moines, and Mark Godwin, Des Moines, for appellant.

Brad P. Schroeder of Hartung & Schroeder, Des Moines, and Bruce H. Stoltze of Stoltze & Updegraff, P.C., Des Moines, for appellees.

**HECHT, Justice.**

This case was remanded to the district court for determination of whether a class should be certified and for determination of what, if any, part of the City's franchise fees for gas and electricity services are related to its administrative expenses in exercising its police power. *Kragnes v. City of Des Moines*, 714 N.W.2d 632, 643 (Iowa 2006) (*Kragnes I*). The district court certified a class, found the franchise fees cannot exceed $1,575,194 per year for the electric utility and $1,574,046 for the gas utility, entered judgment in favor of the certified class against the City in the amount by which such fees exceeded that amount for the period from July 27, 1999, to May 26, 2009, and retained jurisdiction to determine the amount of money to be refunded to members of the class, the manner in which the refunds must be made, the fees to be paid to counsel for the plaintiff class, and the costs of this action. The City appeals and Kragnes cross-appeals. We affirm the judgment as modified and remand for further proceedings.

## I.  Background Facts and Proceedings.

The background facts of this case are fully described in *Kragnes I*, 714 N.W.2d at 633–37. In 2004, the City of Des Moines considered raising property taxes to hire more police and firefighters, maintain the library's hours, and rehabilitate certain deteriorating neighborhoods. The City realized the state was phasing out sales and use taxes on residential gas and electric services and determined that it would be possible to increase the franchise fees on these services to raise revenue. After deciding this source of revenue was preferable to an increase in property taxes, the City renegotiated the franchise agreements with MidAmerican Energy (MEC), which provided gas and electric service for the city, and increased the franchise fee from 1% to 3% for both gas and

electric services effective September 2004. Effective June 2005, the franchise fees were increased to 5% for each utility.

Lisa Kragnes promptly filed a petition in equity on behalf of herself and all others similarly situated challenging the franchise fees as illegal taxes. She sought reimbursement for all illegal taxes paid through the allowable statute of limitations and sought an injunction prohibiting the City from charging such franchise fees in the future. The district court granted Kragnes's motion for summary judgment and the City appealed. We concluded in *Kragnes I* that

> a city has the authority to assess a franchise fee expressed as a percentage of the gross receipts derived from the utility's sale of its services to the public, so long as the charge is reasonably related to the reasonable costs of inspecting, licensing, supervising, or otherwise regulating the activity that is being franchised.

*Id.* at 642–43. Because there was a genuine issue of material fact as to whether all or part of the franchise fees were reasonably related to the City's administrative expenses in exercising its police power, we remanded to the district court for the determination of whether a class should be certified and for a trial on the merits. *Id.* at 643.

On remand, the district court certified a class consisting of all City of Des Moines utilities customers who paid the electricity or gas franchise fee from July 27, 1999, forward. The City filed three motions to decertify the class, all of which were denied. After trial, the district court determined that a portion of the franchise fee collected was excessive. The court held the City must refund to the class, with interest, the amount by which the franchise fees exceeded $1,575,194 per year for the electric utility and $1,574,046 for the gas utility. The court retained jurisdiction to determine the details of how the refund would be calculated and refunded to class members. The court also

concluded injunctive relief was unnecessary because the legislature had amended Iowa Code section 364.2(4)(*f*) to allow municipalities to impose franchise fees in excess of the reasonable cost of inspecting, licensing, supervising, or otherwise regulating utilities' activities. *See* 2009 Iowa Acts ch. 179, § 228 (codified at Iowa Code section 364.2(4)(*f*) (Supp. 2009)).

Both the City and Kragnes sought, and we granted, interlocutory appeal. The City contends the district court should have granted its motion to decertify the class for two reasons: (1) a fundamental conflict exists between members of the class, and (2) class members are not permitted to "opt out" of the litigation. In the alternative, if this litigation is allowed to proceed as a class action and a remedy is owed, the City contends the class should be divided into subclasses. The parties disagree as to the categories and amounts of expenses that may be counted as "reasonably related" to the administration of electric and gas franchises during the relevant time period. The City contends the district court erred in failing to include as proper components of the franchise fee the lost value of its trees and certain indirect operating costs attributable to the utility franchises and in undervaluing as fee components certain "non-annual unpredictable expenses attendant to the City's police power responsibilities." Kragnes contends in her cross-appeal that the district court erred in allowing as franchise fee components construction and engineering costs funded by federal and state government appropriations or the Wastewater Reclamation Authority, construction and overhead costs covered by sewer treatment fees paid by users of the City's sanitary sewer system, administrative overhead in the amount of 12.78% added to construction and

engineering expenses charged by contractors, and interest on construction and engineering expenses.

The parties also hotly dispute the parameters of the remedy in this appeal. The City contends the district court erred in concluding the plaintiff class is entitled to a refund, while Kragnes contends a full refund must be ordered and injunctive relief should be granted requiring the City to amend its ordinances in compliance with the amended legislation found in sections 364.2(4)(*f*) and 384.3A, including providing public notice and identifying the City's costs of regulating the franchises and what amounts it seeks in excess of its regulation costs.

## II. Scope of Review.

The parties agree as to the scope of review for the various issues raised. We will review a district court's rulings regarding the certification of a class for an abuse of discretion. *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 44 (Iowa 2003). "This discretion has been characterized as 'broad.'" *Vignaroli v. Blue Cross of Iowa*, 360 N.W.2d 741, 744 (Iowa 1985) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1785, at 134 (1972)). Because the case was tried in equity, we will review de novo the district court's conclusions regarding which of the City's claimed expenses were reasonably related to the administration of the gas and electric franchises. Iowa R. App. P. 6.907; *Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 811 (Iowa 2000). We may give weight to the findings of the district court, but we are not bound by them. *Fencl*, 620 N.W.2d at 811. Our review of the district court's decision to grant Kragnes and the class a full refund is also de novo. We will review the district court's application and interpretation of statutes for errors at law. *Beganovic v. Muxfeldt*, 775 N.W.2d 313, 317–18 (Iowa 2009). To the extent the City's argument that members of

the plaintiff class must be allowed to opt out of the class raises a constitutional claim, our review is de novo. *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 73 (Iowa 2010).

**III.  Discussion.**

**A.  Should the Class Have Been Decertified Because of a Conflict Among the Members?**  The City argues the district court should have granted its motion to decertify the class because a conflict of interest exists between Kragnes, as the class representative, and other members of the class who will suffer economically as a result of a judgment in favor of the class.  Specifically, the City contends it imposed the franchise fees in lieu of raising property taxes.  The franchise fees were paid by anyone in the city who utilized gas and electric service, whether or not they owned property.  Further, if the City is required to refund the roughly $40 million in excess tax that was collected from 2004 until 2009, it will need to raise the revenue for this payment.  The City contends the most likely result of a refund is an increase of property taxes.  Because the burden of any prospective tax increase imposed to finance the refund will be borne only by current property owners, the City contends property owners will be required to pay a larger proportion of the refund than they paid when the illegal tax was collected from all utilities customers in the city.  In other words, the City contends a fundamental conflict exists between Kragnes and class members who are property owners and who would tend to oppose Kragnes's refund objective because they benefitted from the collection of the excessive franchise fees from payors who were not property owners.  The district court concluded the claimed conflict was speculative and denied the City's motion.

One of the prerequisites for class certification is that the class representative will "fairly and adequately . . . protect the interests of the class." Iowa R. Civ. P. 1.262(2)(*c*). The City contends Kragnes cannot protect the interests of the certified class because she has a conflict of interest in the maintenance of the class action. *See id.* r. 1.263(2)(*b*) (providing assessment of whether the class representative "fairly and adequately will protect the interests of the class" turns *inter alia* on a finding that the representative has no conflict of interest). However, "[n]ot every disagreement between a representative and other class members will stand in the way of a class action suit. The conflict must be fundamental, going to the specific issues and controversies." *Vignaroli*, 360 N.W.2d at 746 (citation omitted).

The City relies on two opinions from the Eleventh Circuit Court of Appeals to support its argument that the intraclass conflict in this case is so fundamental as to preclude certification or require decertification. In *Pickett v. Iowa Beef Processors*, a group of cattle producers filed an antitrust suit against Iowa Beef Processors (IBP), a meat packer. 209 F.3d 1276, 1277 (11th Cir. 2000). The plaintiffs alleged IBP had used forward contracts[1] and marketing agreements[2] to coerce producers selling cattle on the spot markets to accept lower prices in violation of the Packers and Stockyards Act. *Id.* at 1278. The plaintiffs specifically asserted IBP had used the forward contracts and marketing agreements

---

[1]A "forward contract" is an agreement between a packer and a producer establishing the price to be paid for the cattle weeks or months before the animals are ready for slaughter. *Pickett*, 209 F.3d at 1278.

[2]"Marketing agreements" are "more extended versions of forward contracts." Under such agreements, the producer "promises to sell most of its cattle to a packer at prices determined by a negotiated formula, which can be adjusted after slaughter according to the quality of the beef." *Id.*

to create a "captive supply," depress the market price at strategic times, and force producers selling on the spot market to accept artificially low prices for their fattened cattle. *Id.* The relief sought by the plaintiffs for the class included damages and an injunction prohibiting IBP from using such purchasing arrangements in the future. *Id.* at 1280. The district court certified a class of all cattle producers who sold cattle directly to IBP from February 1994 through and including the date of certification— a class of at least 15,000 members including both producers who sold cattle on the spot market and those who sold cattle under forward contracts or marketing agreements. *Id.* at 1279. On appeal, the Eleventh Circuit Court of Appeals reversed, holding that the plaintiffs could not adequately represent a class consisting of both producers who sold on the spot market and those who sold under forward contracts and marketing agreements. *Id.* at 1280–81. The court reasoned that the class could not include both the spot market producers who had allegedly been harmed by the forward contracts and marketing agreements and the producers who had benefitted from such marketing vehicles and wished to continue doing so. *Id.* at 1280 (noting the certified class "includes those who claim harm from the very same acts from which other members of the class have benefitted").

In *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, a group of pharmaceuticals wholesalers filed an antitrust action alleging the defendant Abbott Laboratories made agreements with other defendant drug manufacturers preserving Abbott's monopoly position in the market for the drug Hytrin (terazosin hydrochloride) and keeping less expensive generic alternatives off the market. 350 F.3d 1181, 1183–84 (11th Cir. 2003). The district court certified a class including all entities who purchased Hytrin from Abbott at any time during the periods

commencing March 31, 1998, through August 13, 1999. *Id.* at 1186. On appeal, the Eleventh Circuit Court of Appeals reversed, concluding the plaintiffs had failed to prove they could adequately represent the class that included some wholesalers who resold Hytrin on a cost-plus basis and other wholesalers who utilized other pricing formulas. *Id.* at 1190. The court reasoned that a potential, significant conflict among the class members was suggested by the disparate pricing schemes of the class members.[3] *Id.* at 1190–91. Because the record on appeal suggested those wholesalers who sold on a cost-plus basis would, unlike other wholesalers in the class, lose both margin and volume from generic competition preferred by other class members, the court reversed the class certification order and remanded for development of the evidentiary record as to the potential conflict.[4] *Id.* at 1192.

The City contends the economic conflict of interest among the class members in this case is as fundamental as the conflicts perceived by the courts in *Pickett* and *Valley Drug.* Suggesting many of the members of the class are hostile to the refund because, as property taxpayers, they will be adversely affected by it, the City asserts the district court abused its discretion in certifying and refusing to decertify the class.

Kragnes denies the alleged intraclass conflict is fundamental. First, she notes that the fact that some members of the class do not favor the lawsuit is not sufficient to defeat certification of the class. *Vignaroli*,

---

[3]The defendants alleged that three national wholesaler class members whose transactions with Abbot constituted over 50% of the class claims were among those who sold Hytrin on a cost-plus basis and likely derived more profit from sales of branded products than from sales of generic drugs. *Valley Drug*, 350 F.3d 1190–91.

[4]The need for the development of the evidentiary record was the result of the district court's ruling precluding "downstream discovery" on the subject of the wholesalers' sales practices bearing upon whether the cost-plus sellers achieved a net gain as a consequence of the unavailability of the competing generics. *Id.* at 1192.

360 N.W.2d at 747. She argues the "crux" of the case against the City is the illegality of the franchise fee and there is no conflict among the members as to that issue. She argues the nature and extent of the refund of the illegal franchise fees collected by the City are secondary to the liability issue. Because it is unknown how the City will choose to fund the judgment against it in this case, Kragnes contends the fear that some members of the class will suffer a loss as a result of any refund is based on speculation. She points out that as of the time of trial, the City had not decided how it was going to cover the cost of any refund and that it had considered options other than raising property tax, such as reducing administrative expenses, cutting or deferring capital improvements, or obtaining funding through long-term debt. As a property owner in Des Moines, Kragnes contends she is in the perfect position to represent the interests of other property-owning class members as she weighs the benefits of a refund against the potential consequences.

We find no abuse of the district court's broad discretion in certifying and refusing to decertify the class. The heart of this case is the illegality of the franchise fee imposed by the City, and we agree with Kragnes that there is no fundamental conflict among the class members as to that issue. *See Vignaroli*, 360 N.W.2d at 746–47. Each of the class members paid fees that the City should not have collected and in this fundamental respect their claims are identical, consistent, and compatible.

Although the City claims an economic conflict exists among class members, the district court did not abuse its discretion in reaching a contrary conclusion. To the extent the City contends this lawsuit will cause adverse consequences for property owners, we again note Kragnes

herself is a property owner sharing that status with other property owners in the city.[5]  The City seeks to neutralize the significance of this status shared by Kragnes and the other property-owning members of the class with a retrospective and a prospective analysis of the alleged economic conflict.  In each of these analyses, however, the assertion of a fundamental conflict is substantially based on speculation.

In its retrospective analysis of the claimed conflict, the City contends the property owners would have preferred the City generate revenue through franchise fees paid by both property owners and nonowners alike rather than impose a property tax increase not directly shared by nonowners.[6]  But this contention is infused with speculation as to whether and how much the City would have chosen to increase property taxes if it had not imposed the illegal franchise fees.  Although the record indicates the City *considered* increasing property taxes to raise funds for certain expenditures, it is impossible to know how much, if at all, the City's elected leaders would have increased property taxes had they not chosen instead to utilize the illegal franchise fees to raise revenue.  Viewed from the precollection vantage point, the City's conflict argument assumes the City would have raised property taxes and would have raised them in such an amount that at least some property owners would have paid more in increased property taxes than they ultimately

---

[5]The federal cases cited by the City for the proposition that class certification is improper when some members of the class benefited from the same conduct that harmed other members do not involve a named representative who arguably benefited from the conduct and thus shares the interest of the other class members who benefited.

[6]The City's contention that the interests of property owners and nonowners conflict fundamentally because owners bear the burden of real estate taxes and therefore have an aversion to tax increases not shared by nonowners is tinged with speculation to the extent owners pass along property tax increases to nonowners through rents.

paid in franchise fees. We decline to engage in the retrospective speculation undergirding the City's assumption that the singular fiscal alternative to increasing franchise fees was an increase in property taxes. Other feasible precollection alternatives—including a decision against raising additional revenue—were available to the City. Thus, from the precollection vantage point, the contention that the interests of Kragnes are misaligned or fundamentally in conflict with those of other class members is speculative at best.

When the alleged conflict between the interests of Kragnes and other property-owning members of the class is viewed prospectively from the postcollection or "refund" vantage point, we again find an abundance of speculation. Here the City's conflict analysis assumes any refund will be financed through a property tax increase in such an amount as will cause at least some property owners to pay more in increased property taxes than they will receive in refunded franchise fees. Although this prospect cannot be ruled out, the district court did not abuse its discretion in failing to assume the refund will be financed solely through a property tax increase.[7]

In the last analysis, the City's characterization of the conflict between the interests of Kragnes and other class members is rife with speculation—beginning with speculation about what City leaders would have done in the past and ending with predictions about what City

---

[7]As we have already noted, the general assembly recently adopted legislation untethering the amount of franchise fees from the municipality's cost of inspecting and maintaining the utility. *See* Iowa Code § 364.2(4)(*f*). Under the new regime, the amount of franchise fees is instead limited prospectively to a maximum of 5% of the customer's utility bills. *Id.* We decline to speculate about whether the City will finance the refund through this (or any other) revenue stream, through prospective budgetary and fiscal alternatives, or from a combination of such policy choices. The district court will on remand take evidence informing its decision on the appropriate structure of the refund mechanism.

leaders will do in the future. And in between is speculation about the effect of hypothetical decisions on property owners. Did they pay less in franchise fees than they would have paid in property taxes had the franchise fees not been increased? Did some nonproperty-owning class members pay more in increased franchise fees than they would have paid through rent increases occasioned by property tax increases had the franchise fees not been increased? How, if at all, will property tax rates be affected by the refund remedy ultimately fashioned in this case?[8] *See Hispanics United of DuPage Cnty. v. Vill. of Addison*, 160 F.R.D. 681, 690 (N.D. Ill. 1995) (claimed conflict of interest between class members whose property would be destroyed by village's redevelopment plan and class members whose property would not be destroyed and might increase in value was "dependent on myriad factors that cannot be forecast with any degree of certainty" and did not defeat request for certification of class).

Furthermore, even if we assume without deciding that some members of the class prefer to leave their right to a refund unremedied, this does not mandate a determination that the district court abused its discretion in certifying a class in this case. *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 781 (9th Cir. 1986) (no abuse of discretion in certifying class including retired teachers and teachers presently working in action challenging use of sex-segregated actuarial tables in calculating retirement benefits notwithstanding the prospect that if the suit were to

---

[8]Just as it is possible the City's elected leaders who made the decision to collect the fees in question might have chosen not to provide certain services instead of collecting the fees had they understood their collection was illegal, we cannot know how the current and future City leaders will choose to finance any refund that might be required. We will not speculate whether the refund will be financed through spending reductions, tax increases, fee enhancements, or some combination of these and other alternatives, nor do we express an opinion as to how the refund should be structured in view of the alternatives shown by the evidence on remand to be available under the circumstances.

result in higher benefits for some class members, larger contributions would be required of presently working teachers); *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 578 (D. Minn. 1995) (in action brought by dealer challenging manufacturer's imposition of an advertising charge as unfair business practice, impermissible conflict precluding class certification not shown by evidence that some class members benefit from or prefer the marketing program); *Martino v. McDonald's Sys., Inc.*, 81 F.R.D. 81, 85–86 (N.D. Ill. 1979) (concluding defendant-franchisor's assertion that most McDonalds' franchisees were content with the franchisor's systems, saw no merit in plaintiff's antitrust claims, or preferred to leave the violation of their rights unremedied did not preclude certification of a class of franchisees). We acknowledge that other courts have declined requests for class certification or affirmed such rulings on appeal in some cases based on evidence tending to establish a strong opposition of some class members to the objectives of the suit filed by the named plaintiffs. *See, e.g., Gilpin v. Am. Fed. of State, Cnty., and Mun. Emps.*, 875 F.2d 1310, 1313 (7th Cir. 1989) (affirming denial of certification of a class of all nonunion employees in an action seeking restitution of agency fees on the ground that one segment of the class wished to weaken or destroy the union and the other segment of "free-riders" wished merely to shift as much of the cost of union representation as possible to the union members); *Alston v. Va. High Sch. League, Inc.*, 184 F.R.D. 574, 579–80 (W.D. Va. 1999) (declining request for certification of class in action seeking injunctive relief where majority of members of the purported class opposed disruption of the status quo that would result from the injunctive relief sought by plaintiffs). As the applicable standard of review accords broad discretion to the district court in this matter, however, we find no

reversible error in the district court's determination that no fundamental conflict of interest between Kragnes and other class members precluded certification or mandated decertification in this case.[9]

As we have described in the past, our class action rules "are remedial in nature and should be liberally construed to favor the maintenance of class actions." *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 320 (Iowa 2005). The goal of the class action rule is the

> "efficient resolution of the claims . . . of many individuals in a single action, the elimination of repetitious litigation and possibly inconsistent adjudications involving common questions, related events, or requests for similar relief, and the establishment of an effective procedure for those whose economic position is such that it is unrealistic to expect them to seek to vindicate their rights in separate lawsuits."

*Id.* (citation omitted).

The litigation of this case has resulted in two Supreme Court opinions, a forty-nine page district court decision after a fourteen-day bench trial involving the testimony of twenty-eight witnesses, including eight experts—three for the City and five for Kragnes. The record fills five bankers' boxes. However, Kragnes's claim standing alone would likely fall within the jurisdictional limit of the small claims court. We think this case demonstrates the very necessity and importance of class action litigation both for the plaintiffs and for the City. The likelihood of a plaintiff bringing such a complex suit requiring substantial resources to litigate in small claims is highly unlikely. And if she, and scores of thousands of others like her, did bring their claims individually, it could easily overwhelm the legal department of the City and the resources of

---

[9]We express no opinion at this juncture whether further proceedings in this matter will justify the division of the class into subclasses. *See* Iowa Rs. Civ. P. 1.262(3)(*c*), 1.265(1)(*a*).

the Polk County district court, and would likely result in inconsistent adjudications.  We affirm on this issue.

**B**. **Must Members be Allowed to Opt Out of the Class?**  Rule 1.263(1) provides a list of factors to be considered by the district court when determining whether a class action should be permitted for the fair and efficient adjudication of the controversy, including:

> *a.* Whether a joint or common interest exists among members of the class.
> *b.* Whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for a party opposing the class.
> *c.* Whether adjudications with respect to individual members of the class as a practical matter would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Iowa R. Civ. P. 1.263(1).  The district court specifically found that multiple lawsuits over the subject matter of this case could cause substantial harm to the rights of different class members because different results might occur in the thousands of potential cases.  The court also noted this large number of claims could, if pursued individually, overwhelm the City's legal department.  These findings have special significance in the court's determination of whether class members may opt out of the class under rule 1.267(1).

Rule 1.267(1) provides that a member may not elect to be excluded from the action if "[t]he certification order contains an affirmative finding under rule 1.263(1)(*a*), (*b*), or (*c*)."  Iowa R. Civ. P. 1.267(1). Notwithstanding the district court's affirmative findings under each of the subsections of rule 1.263(1), the City relies on *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985), for the

proposition that individual members of a class have a due process right to opt out of class litigation. *Shutts* involved a class action lawsuit against Phillips Petroleum, a company that produced natural gas from leased land in eleven different states. 472 U.S. at 799, 105 S. Ct. at 2967, 86 L. Ed. 2d at 633. The plaintiffs brought suit in Kansas claiming to represent a class of 28,000 royalty owners from all fifty states and several foreign countries with ownership interests in the leased properties. *Id.* Phillips challenged the inclusion of nonresidents within the class, contending "that unless out-of-state plaintiffs affirmatively consent, the Kansas courts may not exert jurisdiction over their claims." *Id.* at 806, 105 S. Ct. at 2971, 86 L. Ed. 2d at 638. Phillips argued that many of the members of the proposed class lacked minimum contacts with Kansas and could not be bound, consistent with the due process clause, by a judgment of the Kansas court. *Id.* After a discussion of the development of and rationales for class action litigation, the Supreme Court "reject[ed the] contention that the Due Process Clause of the Fourteenth Amendment requires that absent plaintiffs affirmatively 'opt in' to the class, rather than be deemed members of the class if they do not 'opt out.' " *Id.* at 812, 105 S. Ct. at 2974–75, 86 L. Ed. 2d at 642. The Court concluded that the "procedure followed by Kansas, where a fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to 'opt out,' satisfie[d] due process." *Id.* at 812, 105 S. Ct. at 2975, 86 L. Ed. 2d at 642. Contrary to the City's understanding of the case, *Shutts* does not stand for the proposition that the Due Process Clause mandates that all class members must have the opportunity to opt out of a class action case.

In a subsequent case, the Supreme Court granted certiorari to determine whether an Alabama court's certification of a class and

approval of a settlement agreement resolving the claims of class members violated the Due Process Clause of the Fourteenth Amendment because all class members were not afforded the right to exclude themselves from the class or the agreement. *Adams v. Robertson,* 520 U.S. 83, 85, 117 S. Ct. 1028, 1029, 137 L. Ed. 2d 203, 207 (1997). However, the Court did not decide the issue as it determined certiorari was improvidently granted because the parties did not raise the federal issue below. *Id.* The Court noted that its decision in *Shutts* was limited to the determination of whether the Kansas court had jurisdiction over out-of-state class members. *Id.* at 88–89, 117 S. Ct. at 1030, 137 L. Ed. 2d at 209.

The Iowa rules regarding class actions were adopted in 1980 and were based on the Model Class Actions Act. *See* Unif. Class Actions Act, 12 U.L.A. 93 (2008). The commissioners' comment to section 8 of the Model Act, which corresponds to Iowa rule 1.267(1), provides:

> Under some circumstances members of a plaintiff class cannot elect to be excluded because they are indispensible parties. This would be determined by the court in ruling on certification considering the criteria of Section 3(a) [Iowa rule 1.263(1)]. Such situations might arise in actions comparable to those under Federal Rule 23(b)(1); see 3B Moore's Federal Practice, ¶23.35. In most situations members of a plaintiff class will be permitted to elect to be excluded.
> A class member aggrieved by an affirmative finding under Section 3(a)(1), (2) or (3) might seek relief through one of the extraordinary writs or through an interlocutory appeal if authorized by the state practice.

*Id.* § 8 cmt., 12 U.L.A. 109. Similarly, class actions certified pursuant to Federal Rule 23(b)(1) do not permit members of a plaintiff class to opt out of the litigation. Certification pursuant to Federal Rule 23(b)(1) requires the court to make findings nearly identical to the findings required by

Iowa rule 1.263(1).[10]  Members of a class certified pursuant to Federal Rule 23(b)(1) are not provided an opportunity by the rule to exclude themselves from the action.  7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1786, at 496–97 (3d ed. 2005).  Rather, "it is reasonably certain that the named representatives will protect the absent members and give them the functional equivalent of a day in court." *Id.* at 496.

We believe the procedural safeguards in our rules of civil procedure regarding class actions take into account due process concerns of all parties involved—both the plaintiff class members as well as the defendants.  Accordingly, we reject the City's contention that the district court's application of rule 1.267(1) violates due process because class members are not given the option of excluding themselves from the plaintiff class under the circumstances of this case.

**C.  Did the District Court Properly Determine What Costs Were Allowable as Regulation of the Franchises?**  The district court concluded that an annual amount of $1,575,194 should be allocated to the City's administrative expenses in maintaining and managing the

---

[10]Federal Rule 23 provides, in relevant part

**(b)  Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)**  prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class member that, as a practical matter, would be dispositive of the interests of the other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23.

electric utility and $1,574,046 should be allocated for the City's maintenance and management of the gas utility. These amounts included increased construction costs due to the presence of utilities, increased operating costs due to the presence of utilities, degradation costs, disruption costs, the cost of the franchise fee study, and one-time, unexpected acute costs. Both parties take issue with several of the costs allowed, or not allowed, by the district court.

Our decision in *Kragnes I* directed the district court to "determine what, if any, part of the franchise fees are related to the City's administrative expenses in exercising its police power, including the costs associated with any incidental consequences of the franchised services." *Kragnes I*, 714 N.W.2d at 643. This does not require the City to calculate its administrative expenses to a mathematical certainty. *Id.* at 642. The district court concluded that Kragnes, as the plaintiff, bore the burden of showing what, if any part of the franchise fees are not related to the City's administrative expenses and neither party challenges on appeal this allocation of the burden. However, the parties disagree with several specific costs the district court found the City should or should not be able to recover through the franchise fee.

1. *Lost value of trees.* The district court did not include the lost value of the City's trees due to trimming and removal to accommodate the utilities as an allowable incidental cost of the franchise. The City contends this was error.

Both the City and Kragnes offered expert testimony appraising the value of the trees located in the right-of-way which are trimmed or

removed by MEC[11] to accommodate electric lines. The City's expert, Keith Majors, conducted a survey of a portion of the City's right-of-way, attempting to count and value the trees that had been trimmed or removed. Majors opined the City's trees suffered approximately $5.2 million in damage each year due to MEC's trimming. Although Kragnes contends the loss of value of the trees in the right-of-way is not the type of cost that should be considered part of the City's administration of the franchise, Kragnes also provided expert testimony from Jim Rock as to the value of the trimmed and removed trees. Rock attempted to recreate Majors' survey and testified he was unable to verify Majors' calculations of the number, type, and size of private and public trees affecting the right-of-way. Although Rock identified more trees affecting the right-of-way than did Majors, his appraisal of the value of the damage sustained by the City's trees was significantly less than Majors' estimate. He concluded the annual loss of value was $622,981. Rock opined that Majors' calculations failed to account for the fact that the trees are only trimmed, on average, once every five years and that the damage assessed in Majors' report was cumulative rather than annual.

The district court concluded the lost tree value was not the type of incidental consequence that should be considered by the court in calculating an appropriate franchise fee because it is "nothing more than a theoretical concept." The district court further noted if it were to consider tree damage a cost related to the administration of the franchise, it would accept Rock's valuation of the damage.

---

[11]Trial testimony established that MEC did not perform the trimming itself during the years at issue but contracted with Wright Tree Service for the maintenance of all trees, publicly and privately owned, interfering with the electric lines.

The City contends the damage to the trees is analogous to the damage done to sidewalks and streets as a consequence of the maintenance of the utility, a degradation cost which was allowed by the district court as a component of the franchise fee. As the City argues, trees are valuable assets which are damaged when they are trimmed to accommodate electric lines, no matter how carefully the trimming is done. Although trees may be pruned to promote growth and health, trees that are trimmed to accommodate electric lines are trimmed without regard to the utility, function, and beauty of the tree. They are trimmed only to provide sufficient clearance for the electric lines. Rock agreed that the *trees* are damaged when they are trimmed but disagreed that the *City* suffers a loss when the trees are trimmed because the City, or any owner, also receives a benefit from the trimming of the trees—the safe and reliable delivery of electrical service. This benefit offsets any loss, argues Kragnes.[12]

Our review of the record leads us to agree with the City that the trees in the right-of-way are valuable assets and even when the trimming done by the utility is done correctly and in accordance with the best trimming practices, the trees are damaged in a quantifiable manner. However, we find Rock's valuation of the tree damage to be more credible and conclude the amount of $622,981 should be allocated to the maintenance of the electric utility.

2. *Indirect operating costs.* The City contends the district court undervalued the indirect operating costs associated with maintaining

---

[12]Kragnes also elicited testimony at trial and argues in her brief that MEC enjoys immunity for any damage sustained by the tree due to its trimming as long as the trimming was in accordance with best practices. Kragnes, however, cites no authority for its immunity argument and accordingly, we deem the argument waived. Iowa R. App. P. 6.903(2)(*g*)(3).

and managing the right-of-way in which the gas and electric utilities are located. Kragnes and the City agree that a portion of the City's operating costs are appropriately included in the franchise fees. Specifically, Kragnes agrees that to the extent the City's costs to maintain the right-of-way are increased because of the presence of the utilities, those increased costs are appropriately included as a component of the franchise fee. However, the City seeks to recover 6% of the total costs of the general maintenance of the right-of-way—costs that would be incurred whether or not the utilities were present in the right-of-way. The City contends a portion of the total cost of maintaining the right-of-way is nonetheless appropriately included as a component of the franchise fees because the City incurs the cost of maintaining the right-of-way through which the utilities run for the benefit of the general public. The City contends all users of the right-of-way benefit from the City's maintenance and management of the right-of-way, including the utility providers, so it is appropriate to recoup a portion of the cost of maintaining and managing the right-of-way through the franchise fees.

We agree with Kragnes that the cost of maintaining the right-of-way that would be incurred whether or not the utilities were present is not appropriately included in the franchise fee amount. The costs the City would incur to maintain the right-of-way even if the utilities were not located there are not an incidental consequence of inspecting, licensing, supervising, or otherwise regulating the franchised activity. We agree with the district court's conclusion that the allowable indirect operating costs are $107,824 per year per utility.

3. *Other/acute costs.* The City argued that it is appropriate to include an annual amount intended to cover the cost of unexpected, acute costs related to managing or administering the franchise and

sought an allocation of $250,000 per year per utility. The City's expert, Nick Dragisich, conducted a study of the City's expenses incurred due to the management and maintenance of the gas and electric utility franchises. Dragisich noted that study did not include or consider "unforeseen and/or emergency costs" related to the franchise management. The study noted that such unpredictable events did not occur in the time frame covered by the study, from 2001 through 2006, but cited as examples of such events "the ice storm [in] 1991 and the snow storm of 1998" which caused "considerable damage" and resulted in "considerable costs" to the City in cleaning the debris from the right-of-way. The City also offered testimony of other one-time acute costs including $1.625 million to bury electric lines at the City's expense to promote development and the City's $1.6 million settlement of a tort lawsuit for a pedestrian injured on a City grate providing access to a gas line.

The district court concluded the franchise fee can recover unexpected acute costs, but concluded $100,000 per year per utility was an appropriate amount. Both the City and Kragnes appeal the district court's valuation of this component of the franchise fee. The City contends the full $250,000 it requested for each utility should be counted. Kragnes asserts no amount should be counted for unexpected acute costs. In the alternative, Kragnes argues that even if it is reasonable to count some amount for unexpected acute costs, the City has failed to present evidence to support either the amount it requested or the amount included in the franchise fee by the district court.

Although we agree the category of unexpected "acute" costs could be counted as a component of a franchise fee in an appropriate case, we conclude the record in this case provides inadequate support for its

inclusion here. The City offered general testimony tending to prove it spent $1.6 million to bury electric lines, but we find such costs are in the nature of capital expenses rather than acute costs. We further conclude the settlement of the tort claim was not reasonably related to the cost of inspecting, licensing, supervising, or otherwise regulating the activity that is being franchised, and therefore the district court correctly declined to count the item as a component of the franchise fee. Lastly, the City produced testimony that various storms cost "hundreds of thousands of dollars" to clean up. Although the City is not required to account for its franchise-related administrative expenses to a mathematical certainty, we conclude the evidence as to the cost of the storm clean-up was not in sufficient detail to allocate a value to it. Accordingly, we conclude the district court should not have included any value to the claimed acute costs in the computation of the franchise fees.

4. *Construction costs paid by the federal and state government.* Kragnes contends the district court erred in counting as a franchise fee component an amount for certain increased construction costs. Kragnes's expert, Charles Finch, opined that to the extent some construction projects receive funding from the state or federal government, such construction costs are not actually incurred by the city. Kragnes accordingly contends this component of the franchise fee must be reduced by 35%, an amount calculated by Finch to account for the portion of construction costs offset by state and federal funds. The City, however, asserts Finch's calculations do not bear out. The City's expert, Dragisich, testified that even if it is assumed that 35% of the cost of a construction project affecting the right-of-way is offset by federal or state funds, it does not necessarily follow that the state/federal funds are actually allocated to the portion of the contract that accounts for the

increase in construction costs attributable to the presence of utilities in the right-of-way. Further, the City argues that once state or federal funds are received by the City, they become the City's funds without regard to their source. Simply put, the City contends the court must focus on whether the City proved its construction costs attributable to the presence of the utilities in the right-of-way are increased, and it matters not in calculating the appropriate franchise fee what revenue stream the City used to pay them. We agree. The source of the funds used to pay for the increased construction costs attributable to the utilities is not relevant to the determination of whether such costs are a proper component of the franchise fee.

5. *Construction costs paid by WRA/sewer users on WRA/sewer projects.* Kragnes contends the district court erred in including as franchise fee components any increased construction costs resulting from projects related to the Wastewater Reclamation Authority (WRA)[13] and sanitary sewer. Kragnes argues such costs should not be counted because they are recouped by the City from the WRA and consumers of sewer services.

However, the City's expert explained that the method proposed by Kragnes's expert to "back out" the construction costs of WRA and sewer projects shifts the increased cost of construction due to the presence of gas and electric utilities almost entirely to the WRA and sewer users. He instead opined it is more appropriate to require the customers of utilities to bear their fair proportion of the increased costs and require the City to

---

[13]The WRA is a consortium of cities which provides waste treatment facilities and services to the member municipalities, including the City of Des Moines. The cities each maintain their own sanitary sewer systems for waste collection and connect their systems to WRA facilities for treatment. As the operating contractor for the WRA, the City of Des Moines manages the construction projects for the WRA.

in turn reimburse the WRA and sewer utility to avoid "double-dipping" by the City. The district court credited the City's expert. It did not reduce this component of the franchise fee by the amount the City's construction costs are increased as a consequence of WRA and sewer construction projects and it required the City to "negotiate some method of reimbursement with the enterprise entities to avoid any double recovery."

We also find the City's expert's testimony on this issue credible and agree with the resolution adopted by the district court.

6. *Administrative overhead fee on construction and engineering project bills.* Kragnes asserts the district court erred in counting a 12.78% administrative fee as a component of the franchise fee. She argues this is inappropriate because any increase in administration costs incurred by the contractor due to the presence of utilities are accounted for in the construction contract price. Kragnes further contends that to the extent the 12.78% fee represents additional City personnel cost attributable to administering payment of the construction contracts, it has already been accounted for in the operating expense portion of the district court's calculation of the franchise fee. The City disagrees, contending the administrative fee does not purport to cover additional costs incurred by the construction company but rather addresses the City's additional administrative overhead. The City's expert, Dragisich, was questioned on this precise point and explained that he had taken care to insure that costs were not double counted and that the administrative fee on third-party contracts did not overlap with the operating expenses calculated separately. Dragisich also described the types of additional administrative costs incurred by the City on third-party construction contracts due to the presence of utilities in the right-

of-way. He noted this cost component might include the time required to notify the police and fire departments of the timing and location of road closures and how to reroute emergency vehicles. This component might also include the administrative costs associated with posting notices on the City's website or placing placards on properties informing the public about road closures or temporary utility interruptions attributable to construction.

We find credible Dragisich's testimony that the City does incur some additional administrative overhead in connection with construction projects as a consequence of the presence of utilities. We find such administrative costs have not been counted twice and were therefore correctly included by the district court as a component of the franchise fee.

7. *Interest on the construction costs.* Kragnes contends the district court erred in counting bond expense/interest as an element of the increased construction and engineering costs. She argues that because franchise fees are received quarterly, the City does not need to borrow money to pay construction costs. However, the City's expert testified that while Kragnes's logic might work "in a perfect world," it did not necessarily work in reality. Even if it is assumed the City receives franchise fees quarterly, it does not necessarily follow that the City will always have funds in hand to pay construction contract payments when they are due. The timing of construction projects and the payments due on construction contracts are not necessarily aligned with the City's receipt of franchise fees. Further, as the City's expert noted, the City's construction costs fluctuate greatly from year to year and franchise fee receipts are not necessarily sufficient to cover this category of costs.

Accordingly, we conclude the district court committed no error in counting this category of cost as part of the franchise fee.

8. *Increased construction costs.* Kragnes and the City disagreed as to the amount of increased construction and engineering costs incurred by the City for the accommodation of the gas and electric utilities. Kragnes argues that construction costs were increased by 5% and engineering costs were increased by 3.5% as a consequence of the presence of utility structures and equipment in the right-of-way. The City, however, offered testimony suggesting construction costs are increased by 15% and engineering costs are increased by 20%. The district court found the City's evidence on this issue more persuasive.

The main issue of dispute involves a survey created and implemented by the City's expert. City employees were asked whether their work was affected or increased due to the presence of utilities in the right-of-way. Each employee was also asked how much his or her work increased due to each utility (including gas, water, electric, cable, etc.). The survey respondents assigned a percentage value for each factor. The City's expert, Dragisich, added the values of the increased work and came up with a total increase in work, and concluded engineering costs were increased by 20% and construction costs were increased by 15%. Kragnes's expert, Finch, concluded it was more appropriate to average the increased work for all the utilities, producing a 3.5% increase in engineering costs and 5% increased construction costs.

We note the City's expert had extensive construction experience, including the bidding of construction projects conducted in the right-of-way. He is also a licensed engineer. Although this is a close issue, we credit Dragisich's opinion based on his relevant experience. We agree with the district court's findings that the increased engineering costs

should be valued at 20% and the increased construction costs should be valued at 15%, and adopt them as our own.

**D. Did the District Court Err in Ordering a Refund to all Class Members?** As we have already noted, the district court found the appropriate annual franchise fee is $1,575,194 for the electric utility and $1,574,046 for the gas utility and declared the plaintiff should have a judgment against the City in the amount by which the franchise fees collected during the period commencing July 27, 1999, and ending May 26, 2009, exceeded the annual franchise fee. Citing *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 110 S. Ct. 2238, 110 L. Ed. 2d 17 (1990), the district court concluded the Due Process Clause affords the plaintiff class members a meaningful opportunity to secure postpayment relief for their overpayment of franchise fees. The court further reasoned there must be financial consequences from the illegal taxation of the City's residents notwithstanding that the funds received from the illegal taxation of the City's residents were used wisely, legally, and with the best intentions for the residents.

The court ordered relief in the form of a refund of the franchise fee overpayments in an amount to be determined by the court based on evidence adduced in further proceedings of the actual amount of franchise fees collected during the subject period reduced by the annual franchise fee determined by the court. The City contends that, even if it did charge an excessive franchise fee, the district court erred in concluding the class members are entitled to a refund of any amount they were overcharged.

The City contends *McKesson* and *Hagge v. Iowa Department of Revenue and Finance*, 504 N.W.2d 448 (Iowa 1993), are distinguishable

and provide no legal basis for ordering a refund in this case. We acknowledge the City's contention that the plaintiffs in those cases claimed deprivation of a federal constitutional right (Commerce Clause violation in *McKesson* and intergovernmental tax immunity in *Hagge*) in addition to their due process claims. *See McKesson*, 496 U.S. at 22, 110 S. Ct. at 2242, 110 L. Ed. 2d at 26; *Hagge*, 504 N.W.2d at 449. While it is true that the excessive fees in this case were not found to violate any federal constitutional right, we conclude the reasoning stated in *McKesson* and *Hagge* is compelling, and we therefore apply it in this case.

Meaningful backward-looking relief is especially appropriate to rectify the class members' overpayments under the circumstances presented in this case. "Because exaction of a tax constitutes a deprivation of property," procedural safeguards are generally required to protect against "unlawful exactions in order to satisfy the commands of the Due Process Clause." *McKesson*, 496 U.S. at 36, 110 S. Ct. at 2250, 110 L. Ed. 2d at 35–36. However, because "[a]llowing taxpayers to litigate their tax liabilities prior to payment might threaten a government's financial security," states have been permitted to restrict the ability of the taxpayer to challenge the lawfulness of the tax before it is paid. *Id.* at 37, 110 S. Ct. at 2250, 110 L. Ed. 2d at 36. That was the case here—Kragnes and the other members of the class had no predeprivation remedy. Instead they were required to raise their objections to fees in a postdeprivation refund action.

> To satisfy the requirements of the Due Process Clause, therefore, in this refund action the State must provide taxpayers with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a "clear and certain remedy," for any erroneous or unlawful

> tax collection to ensure that the opportunity to contest the tax is a meaningful one.

*Id.* at 39, 110 S. Ct. at 2251, 110 L. Ed. 2d at 37 (footnote and internal citation omitted).

We further note that Kragnes filed this action soon after the City decided to commence collecting the franchise fees at issue here. On notice of Kragnes's claim that the franchise fees were excessive in amount and therefore illegal, the City nonetheless collected them and, during the pendency of this action, even increased the amount of the fees collected. The failure of the City to respond differently after it was on notice of Kragnes's claim does not mitigate in favor of depriving Kragnes and the class of a remedy for the unlawful taxation. *See id.* at 45, 110 S. Ct. at 2254–55, 110 L. Ed. 2d at 41 (noting State has available a range of procedures to limit the financial impact of refunding taxes, including refraining from collecting a tax which has been declared illegal during the pendency of an appeal or placing disputed funds into an escrow account or utilizing "other accounting devices such that the State can predict with greater accuracy the availability of undisputed treasury funds"). "[The City's] failure to avail itself of certain of these methods of self-protection weakens any 'equitable' justification for avoiding its constitutional obligation to provide relief." *Id.* at 45, 110 S. Ct. at 2255, 110 L. Ed. 2d at 41.

The City cites the Restatement (Third) of Restitution in support of its contention that no refund of any overpayment should be ordered under the circumstances presented here. Section 19(1) of the Restatement states the general rule that a taxpayer who pays an illegally assessed or collected tax, fee, or charge has a claim in restitution against the government to prevent unjust enrichment in the absence of a

different rule imposed by statute. Restatement (Third) of Restitution and Unjust Enrichment § 19(1), at 259 (2011). As has already been noted, this court has ordered a refund when a taxpayer overpaid taxes to the Iowa Department of Revenue and Finance. *Hagge*, 504 N.W.2d at 452. The City contends the district court erred, however, in this case in failing to apply section 19(2) of the Restatement allowing the court to consider whether, under the circumstances of a particular case, a restitutionary remedy should be denied on the ground it would "disrupt orderly fiscal administration or result in severe public hardship." Restatement (Third) of Restitution § 19(2), at 259. Subject to constitutional limitations, the rule stated in section 19(2) authorizes the court to limit relief to the claimant to avoid either adverse governmental consequence. *Id.* § 19 cmt. *b*, at 260. The City directs us specifically to illustration 17:

> City assesses a property tax on a nondiscriminatory basis. The tax is subsequently determined to be improperly authorized and void. In response to Taxpayers' suit against City to recover the tax collected from them, City demonstrates that the revenues illegally collected were spent exclusively on ordinary municipal services benefitting Taxpayers among other residents. Under the circumstances, the court may find that neither City nor its residents have been unjustly enriched at Taxpayers' expense.

*Id.* § 19 cmt. *f*, illus. 17, at 267.

This court rejected an equity-based argument opposing a tax refund in *Hagge*. In that case, the State urged a refund should be denied because such relief would impose an onerous fiscal burden. We concluded, however, that "equity cannot override the clear commands of the Due Process Clause." *Hagge*, 504 N.W.2d at 452. As in *Hagge*, we are not convinced that a properly structured refund in this case will create an onerous fiscal burden on the City or create such disruption

and instability as to give rise to countervailing public interests weighing against a refund.

Undaunted by our rejection of an equitable argument in *Hagge*, the City offers up other equity-based reasons for denying a refund of the excessive franchise fees. Among these reasons are the notion that restitution of the excess fees should not be ordered when the excess fees were paid by a broad-based group and the plaintiff class would essentially recover from itself, and the equitable principle that no refund will be ordered when the improper tax was collected from a broad constituency and the funds were used for the general benefit of a similar public constituency. We conclude the district court correctly declined these equity-based entreaties to forego altogether a refund remedy in this case. This conclusion is strongly influenced by the fact that the City continued and increased its collection of the franchise fees after being put on notice of the claim in this litigation that the fees exceeded the amount authorized by law. Under these circumstances, equitable principles will not shield the City from a refund.[14]

---

[14]We note that although the general assembly ratified the City's collection of electric and gas franchise fees in excess of the cost of regulating the utilities, the legislature declined to retroactively authorize the excessive fees although it clearly knew how. In 2007, the general assembly enacted similar legislation ratifying the imposition of franchise fees for cable television services. *See* Iowa Code § 477A.7(5) (Supp. 2007); *Zaber v. City of Dubuque*, 789 N.W.2d 634, 637 (Iowa 2010). The general assembly explicitly provided that the ratification was retroactive. Iowa Code § 477A.7(5); *Zaber*, 789 N.W.2d at 637. However, in this instance, the legislature decided not to enact a retroactive ratification of franchise fees, but instead made the ratification prospective only. In fact, an early draft of the bill contained a retroactive provision, but that portion was stricken in a vote on the floor of the House. *See* Senate Amendment 3328 to S.F. 478, 83 G.A., 1st Sess. (Iowa 2009) (providing in § 202 that any amount of electric or gas franchise fees previously assessed that exceeds the city's cost of regulating the franchise is "declared to be authorized and legally assessed by and paid to the city"); Journal of the House, Saturday, April 25, 2009, at pages 2072–2075 (motion by Oldson, offering amendment H–1780, which, among other things, struck the ratification language then found in § 221); 2009 Iowa

The City next contends that if a refund is to be required, it should be limited to those class members who can show they would have paid less if the City had raised the same amount of revenue through property taxes. We disagree. We cannot assume the City would have chosen to increase real estate taxes by an equivalent amount if the excessive franchise fees had not been conceived and collected. In the last analysis, the determination of what would have occurred had the excessive franchise fees not been collected would require speculation in which the court will not engage. We conclude the most fair remedy in this case is the refund which will, to the extent possible, refund to members of the plaintiff class the excess fees extracted from them and restore the parties to the status quo ante. We also note the City has available to it the full range of legal tax and fee options, budgetary measures, and spending policy choices to cover the refund and its ongoing future expenses.

Comment *f* to section 19 makes clear that while "[s]ignificant disruption and hardship are grounds to limit restitution . . . the mere fact that relief will be expensive is not." Restatement (Third) of Restitution § 19 cmt. *f*, at 266. It further notes that a restitutionary remedy may be fashioned in a way that minimizes the disruption to the taxing authority, "such as by allowing refunds in the form of credits against future assessments." *Id.* § 19 cmt. *f*, at 267. Our disposition of this appeal will allow the district court to structure the refund in a way that balances the respective interests of the City and the members of the plaintiff class.

---

Acts ch. 179 (amending Iowa Code ch. 364 regarding franchise fees without provision for retroactive ratification of franchise fees). Such retroactive ratification has been approved by this court. *Zaber*, 789 N.W.2d at 656. Thus, the legislature also declined to shield the City from the financial impact of this litigation.

**E. Should the District Court Have Divided the Class Into Subclasses for the Remaining Proceedings?** The City argues that the district court abused its discretion in not dividing the class into subclasses for remedial purposes. Specifically, the City contends that while the class members interests may be sufficiently alike for purposes of the resolution of the legal issue in this case, they have significantly different interests and preferences with regard to the determination of an appropriate remedy. These different interests, the City contends, requires the division of the class into subclasses. The district court concluded the conflict perceived by the City was speculative and declined to divide the class.

The City contends that as a remedial plan is put together, someone must represent the interests of those class members that have an interest in minimizing the amount of the refund. For example, the City contends that the implementation of a remedy must be preceded by an initial determination of whether or not potential class members must submit a claim. The City also contends decisions must be made with regard to the types of notice and information that are to be included with any refund checks or claim forms because these should vary depending on whether the class member favors or opposes the collection of franchise fees as a source of revenue for the City. The City favors the creation of subclasses because it harbors doubts that Kragnes "will vigorously pursue the positions on these issues that are of greatest advantage to those class members who benefit from revenue generation through the franchise fee."

Kragnes contends that to the extent that no conflict exists warranting the decertification of the class, no conflict exists warranting the creation of subclasses. She notes she is a property owner and thus a

member of the group the City contends would likely favor the generation of revenue through franchise fees rather than real estate taxes. However, clearly she does not favor the refund outcome the City predicts for her as a property owner.

We conclude the City's arguments for the creation of subclasses are speculative on this record. We affirm the district court's certification of the class. As administration of this action proceeds on remand, the district court shall exercise its discretion in ruling on motions, if any, requesting the establishment of subclasses. Iowa R. Civ. P. 1.262(3)(*c*).

**F. Did the District Court Correctly Decline to Order the City to Amend its Franchise Ordinances?** Kragnes asserts the district court erred in holding amendments of Iowa Code sections 384.3A and 364.2 do not require the City to amend its franchise fee ordinances. Kragnes contends the City should be enjoined from collecting franchise fees pursuant to the ordinances in effect at the time of this lawsuit until the City enacts a new ordinance in compliance with sections 384.3A and 364.2, which became effective May 26, 2009.

> A franchise fee assessed by a city may be based upon a percentage of gross revenues generated from sales of the franchisee within the city not to exceed five percent, without regard to the city's cost of inspecting, supervising, and otherwise regulating the franchise. Franchise fees collected pursuant to an ordinance in effect on May 26, 2009, shall be deposited in the city's general fund and such fees collected in excess of the amounts necessary to inspect, supervise, and otherwise regulate the franchise may be used by the city for any other purpose authorized by law. Franchise fees collected pursuant to an ordinance that is adopted or amended on or after May 26, 2009, to increase the percentage rate at which franchise fees are assessed shall be credited to the franchise fee account within the city's general fund and used pursuant to section 384.3A. If a city franchise fee is assessed to customers of a franchise, the fee shall not be assessed to the city as a customer. Before a city adopts or amends a franchise fee rate ordinance or franchise ordinance to increase the percentage rate at which franchise

fees are assessed, a revenue purpose statement shall be prepared specifying the purpose or purposes for which the revenue collected from the increased rate will be expended. If property tax relief is listed as a purpose, the revenue purpose statement shall also include information regarding the amount of the property tax relief to be provided with revenue collected from the increased rate. The revenue purpose statement shall be published as provided in section 362.3.

Iowa Code § 364.2(4)(*f*) (Supp. 2009).

The City's ordinances currently in effect authorize the City to collect franchise fees of 5%. However, Kragnes asserts the effect of this lawsuit is "to lower the allowed percentage rate of franchise fee under the City ordinances to the costs of regulation, which is less than 5%." According to Kragnes, if the City wishes to collect a 5% franchise fee, it must enact a new ordinance "to increase the percentage rate at which franchise fees are collected" and comply with the notice and revenue statement requirements of section 364.2(4)(*f*) as well as the spending limitations of section 384.3A for ordinances enacted after May 26, 2009.

The City contends the plain language of section 362.2(4)(*f*) allows it to continue to collect a 5% franchise fee pursuant to its ordinances which were in effect on May 26, 2009. The City points out that the statute explicitly addresses how funds collected pursuant to ordinances in effect on May 26, 2009, may be spent, clearly evidencing an intent to "grandfather in" existing ordinances. The statute further distinguishes between existing ordinances and ordinances enacted or amended after May 26, 2009, and requires cities seeking to amend or enact ordinances after May 2009 to comply with certain requirements.

We are not persuaded by Kragnes's argument that the effect of this lawsuit and our decision in *Kragnes I* is to rewrite the City's franchise fee ordinance. Our decisions simply render the ordinance unenforceable for the designated time frame in excess of the costs to maintain and regulate

the franchise. We agree that the plain language of section 364.2(4)(*f*) grandfathers in franchise fee ordinances in effect on May 26, 2009, and authorizes the collection of up to a 5% franchise fee pursuant to those existing ordinances. The district court correctly declined Kragnes's invitation to order the City to adopt a new franchise fee ordinance.

**IV. Conclusion.**

We conclude the district court did not abuse its discretion in certifying and denying the City's motions to decertify the class. We also conclude the members of the plaintiff class have no due process right to opt out of the class and the failure of the rules of civil procedure to allow them to do so is not unconstitutional.

After our de novo review of the record, we conclude certain amounts allocated or not allocated by the district court as proper components of the franchise fees should be modified. Specifically, we conclude the City should be able to include the lost value of trees due to trimming and removal to accommodate electrical lines in the amount of $622,981 each year for the electric utility franchise. We also conclude the City shall not, based on this record, recoup any amount for unpredictable, acute costs. We affirm in all other respects the district court's determination of the allowable amount of franchise fees. For ease of reference, the franchise fees allowed are as follows.

|  | **Gas Utility** | **Electric Utility** |
|---|---|---|
| **Degradation Costs** | $35,030.00/year | $37,373.00/year |
| **Construction Costs** | $1,314,563.00/year | $1,314,563.00/year |
| **Operating Costs** | $107,824.00/year | $107,824.00/year |
| **Disruption Costs** | $2,038.00/year | $843.00/year |
| **Franchise Fee Study** | $14,591.00/year | $14,591.00/year |
| **Lost Tree Value** | $0.00/year | $622,981.00/year |
| **Acute Costs** | $0.00/year | $0.00/year |
| **Total** | $1,474,046.00/year | $2,098,175.00/year |

We further conclude the district court properly ordered a refund of fees in excess of the totals itemized above. We remand for further proceedings consistent with this opinion, for findings as to the amounts to be distributed to the members of the class, and for a determination of the appropriate restitutionary arrangement by which such amounts shall be paid. And, finally, we conclude the district court correctly denied Kragnes's request for an injunction preventing the City from collecting franchise fees pursuant to the ordinances in effect on May 26, 2009.

**AFFIRMED AS MODIFIED AND REMANDED.**

All justices concur except Cady, C.J., who dissents and Waterman and Mansfield, JJ., who take no part.

**CADY, Chief Justice (dissenting).**

I respectfully dissent. A basic and fundamental conflict exists between the members of the class. This conflict is inimical to the fundamental purpose of class actions and, under the law, does not permit Kragnes to pursue her claim as a class action. I would hold the district court erred in failing to decertify the class.

Several requirements must be met before our law permits class certification. One basic prerequisite is the class representative must "fairly and adequately" protect the interest of the class. Iowa R. Civ. P. 1.262(2)(c). This requirement relates to the associated rule that the claim of the class representative be typical of that of the other class members. When a conflict exists between class members that relates to the issues and is fundamental to the case, class certification is improper. *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003).

The fundamental conflict in this case can be traced to the fundamental economic reality of the relationship between a city and its people. A city is its people, and a government is established by the people to govern and provide public services and protection for the benefit of the people. In turn, the people provide revenue to the government so it can operate to carry out its vital public mission. Thus, the public mission pursued by government is, one way or the other, paid by the people.

In this case, the City of Des Moines sought to raise additional revenue for the purpose of providing more public services in the form of additional police and fire protection, enhanced public library access, and

needed repairs to deteriorating neighborhoods. A city is authorized to raise revenue for such purposes. However, the particular means utilized by the City to raise the revenue was ultimately found in this case to be contrary to the law, but not until the revenue had been collected and spent on the needed services that have been enjoyed by the public.

The representative plaintiff brought this lawsuit not only to force the City to utilize a lawful means to collect its needed revenue, but also to obtain a judgment on behalf of all people who paid the fee equal to the total amount of the revenue that had been collected through the illegal fee. Class certification allowed her to lump together all residents who had paid the illegal tax to elevate the amount of the claim into a substantial judgment. The judgment is so large that the City will now need to raise additional revenue or reduce City services to refund the improper fee to all the residents who paid it. This inevitable result is not speculative. It is logic. It is also economic reality based on sound economic principle. To pay the judgment to the class, the City will need to use existing revenue belonging to the class, tax the class, or cut services provided to the class. These consequences necessarily divide the class and render its members antagonistic. There is little utility in suing yourself, especially when the associated attorney fees and litigation expenses of suing yourself will run into the millions of dollars. Most people would be unwilling to pursue litigation under such circumstances.

Accordingly, this case could not present a more basic conflict between a representative plaintiff and those members of the class who would not want to force city government to find additional revenue to pay the judgment that will inevitably adversely affect most members of the class. In other words, the lawsuit is a microcosm of the larger tension in

society between those who focus on immediate gratification and those who seek to make decisions today with future consequences in mind. This case forces the latter to join in the approach of the former. In this case, the remedy seeks an immediate perceived benefit at a future cost that makes the benefit an illusion. This sleight of hand is found at the heart of the case and presents a most basic conflict that pits the representative plaintiff, who advocates for a refund, against those class members who understand the futility of a refund and would advocate against it. It is simply unfair for our class action law to be used as a vehicle to grow a judgment into an amount that will force the City to take action adverse to the class. A plaintiff who pursues such a goal cannot possibly represent the interest of the remaining class members.

This type of inherent conflict in a class is inconsistent with the use of class action and is not permitted by our law. An analogous case that best illustrates this point is *Ihrke v. Northern States Power Co.,* 459 F.2d 566 (8th Cir.), *vacated as moot,* 409 U.S. 815, 93 S. Ct. 66, 34 L. Ed. 2d 72 (1972). Like this case, *Ihrke* involved an action brought by a utility customer on behalf of all utility customers. 459 F.2d at 567. The legal claim alleged the regulations governing the termination of utility service were unconstitutional because customers had been deprived of adequate prior notice and a fair and impartial hearing prior to the termination of utility services. *Id.* The court found the class was inherently antagonistic because not all customers would be in support of a pretermination hearing. *Id.* at 572. Instead, some customers would "likely . . . feel" that the additional expense of providing a termination hearing would "conceivably result in a rate increase to all customers." *Id.* at 572–73. As with the utility customers in *Ihrke,* many Des Moines taxpayers would be reluctant for government to make expenditures when

they realize those expenditures come from their pocket, one way or the other.

Other courts have expressed a slightly different principle that a class action cannot be maintained when people in the class would oppose the claim or the remedy sought. In *Mayfield v. Dalton*, 109 F.3d 1423, 1424 (9th Cir. 1997), two members of the Marine Corp. sought to certify a class consisting of all members of the armed forces to challenge the constitutionality of a Department of Defense requirement that all soldiers provide a DNA sample for future analysis. The court found the class to be antagonistic because there were "undoubtedly" people in the class who would not oppose the DNA repository and who would want the requirement enforced. *Mayfield*, 109 F.3d at 1427. In this case, there are undoubtedly people in the class who do not oppose the illegal fee used to enhance City operations.

Antagonism also exists in a class when the class consists of people who utilize limited resources from a common pool, and named members of the class seek a remedy that will result in a shift of these limited resources. *See Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006) (finding an inherent conflict precluding class certification when female members of a university rowing team claimed the university was violating Title IX and sought to establish a class consisting of all female participants in university athletic programs because the remedy of compliance with Title IX would not be amenable to all class members because compliance would likely only be achieved by shifting resources from one sport to another); *see also Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357, 364–65 (E.D. Okla. 2001) (finding named plaintiffs' interests were antagonistic because the agency would be required to reimburse money from limited appropriations in order to

make the required refund). There are undoubtedly many people in Des Moines who would oppose a rather insignificant individual refund that will only result in a substantial reallocation of resources or additional taxation.

The conflict in this case is as fundamental as the legal principles that demand the class to be decertified. Class actions are institutions of representation, not opposition. They are institutions of social value and public good, not personal gain. The class needs to have a sense of mission so that all interests are represented. *See Hansberry v. Lee*, 311 U.S. 32, 44, 61 S. Ct. 115, 119, 85 L. Ed. 22, 28 (1940) (holding plaintiff seeking to enforce an agreement cannot represent class members who do not want it enforced); *see also* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1768, at 389 (3d ed. 2005). This case is as far from a class action as a case could be. A single plaintiff should not be permitted to drag nearly an entire community into a lawsuit that seeks a remedy akin to suing yourself.

Kragnes certainly had a right to challenge the government action. She had a right to turn to the courts to force the City to use the proper channels to raise city revenue. She was free as well to seek her own refund. At times, the pursuit of principle alone might be worth the cost, but a class action nevertheless requires the pursuit to be shared by the class. When public monies or public sacrifice will be used to pay for a public interest lawsuit, the representative class requirement for class certification ensures that the public actually supports the effort. Considering the marginal utility of the remedy sought, considering the subsequent legislative adoption of the challenged fee, considering the public benefit provided by the challenged government action, and considering the substantial public expense of litigation, it is doubtful

many class members would share in Kragnes's enthusiasm for her lawsuit. One of the benefits of a class action is that it allows a plaintiff to pursue a claim by giving an attorney a financial incentive to provide representation. It also allows the court to dispose of a multiplicity of identical individual claims in an economical manner. In this case, however, there was no evidence that similar claims were filed or even the fear of a multitude of similar claims. Moreover, while it is important to provide a financial incentive for legal representation in meritorious litigation, it should not, in the end, become the only benefit of a class action.