# IN THE SUPREME COURT OF IOWA

No. 21–0649

Submitted January 18, 2023—Filed April 14, 2023

**ROBERT BENDA,** on behalf of himself and all others similarly situated,

Appellant,

vs.

**PRAIRIE MEADOWS RACETRACK AND CASINO, INC.,**

Appellee,

and

**IOWA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION** and **IOWA THOROUGHBRED BREEDERS AND OWNERS ASSOCIATION,**

Intervenors-Appellees.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

A horseman appeals the district court's refusal to certify a class action to pursue a claim that a horseracing venue breached its contracts with a horsemen's association. **AFFIRMED.**

May, J., delivered the opinion of the court, in which Christensen, C.J., and McDonald and Oxley, JJ., joined. Mansfield, J., filed a dissenting opinion, in which Waterman, J., joined. McDermott, J., took no part in the consideration or decision of the case.

Todd M. Lantz (argued) of the Weinhardt Law Firm, Des Moines, and Tyler M. Smith of Smith Law Firm, PLC, Altoona, for appellant.

Dennis P. Ogden (argued) and Thomas L. Flynn of Brick Gentry, P.C., West Des Moines, for appellee.

Ryan G. Koopmans (argued), Waukee, for intervenor-appellee Iowa Horsemen's Benevolent and Protective Association.

Jeffrey M. Lipman (argued) of Lipman Law Firm, P.C., West Des Moines, for intervenor-appellee Iowa Thoroughbred Breeders and Owners Association.

**MAY, Justice.**

"Our review of the district court's ruling granting or denying certification of a class is limited because the district court enjoys broad discretion" in determining whether class certification is appropriate. *Freeman v. Grain Processing Corp.*, 895 N.W.2d 105, 113 (Iowa 2017) (quoting *Legg v. W. Bank*, 873 N.W.2d 756, 758 (Iowa 2016)). In this case, Robert Benda claims that Prairie Meadows Racetrack and Casino, Inc., (Prairie Meadows) breached contracts that govern the distribution of winnings among owners and breeders of successful horses. Benda appeals the district court's refusal to certify his case as a class action. Based on the specific facts of this unusual case, we do not conclude that the district court abused its broad discretion. There is a reasonable basis in the record to conclude that Benda could not appropriately represent the class. *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 326 (Iowa 2005) ("On appellate review, the question is whether there is any reasonable basis in the record to support the district court's finding."). Specifically, the record shows fundamental conflicts as to (1) the core question of whether Prairie Meadows breached the contracts, and (2) the appropriate remedy: a lump sum of money damages or—as the contracts expressly provide—an equitable remedy involving payouts for future horseraces.

Because the district court acted within its broad discretion, we affirm.

## I. Background.

Prairie Meadows is Iowa's only venue for live pari-mutuel[1] racing of thoroughbred horses. Pari-mutuel horseracing is heavily regulated. At the federal level, the Interstate Horseracing Act regulates "interstate commerce with respect to wagering on horseracing." 15 U.S.C. § 3001(b) (2018); *see id.* §§ 3001–3007. The Act prohibits certain wagers on Prairie Meadows's races unless Prairie Meadows has "a written agreement with the horsemen's group" that represents the majority of owners and trainers racing there. *Id.* § 3004(a)(1)(A); *see id.* § 3002(12) (defining "horsemen's group" for purposes of the Act). For thoroughbred racing, that "horsemen's group" is the Iowa Horsemen's Benevolent and Protective Association (Iowa HBPA). The Iowa HBPA represents over 1,100 horsemen[2] who race thoroughbred horses at Prairie Meadows. Iowa HBPA "promotes the common business interests of the members and strives to improve the conditions of the thoroughbred industry."

There's also state-level regulation. Iowa Code chapter 99D creates a regulatory agency—the Iowa Racing and Gaming Commission (IRGC)—and vests it with broad powers, including the power "[t]o regulate the purse structure for race meetings." Iowa Code §§ 99D.5, .7(5)(*a*) (2018). The Code also imposes some particular duties on the IRGC. For example, section 99F.6 requires the IRGC to "authorize" Prairie Meadows "to use receipts from gambling games and sports

---

[1]There appear to be two alternative spellings: pari-mutuel and parimutuel. The Iowa Code uses "pari-mutuel," and we follow suit. Iowa Code § 99D.2(7) (2018) (defining "[p]ari-mutuel wagering").

[2]In this context, "horsemen" is a gender-neutral term.

wagering within the racetrack enclosure to supplement purses for races particularly for Iowa-bred horses pursuant to an agreement which shall be negotiated between" Prairie Meadows "and representatives of the . . . horse owners." *Id.* § 99F.6(4)(*a*)(3). Those representatives are the Iowa HBPA.

This case focuses on "supplement purses," also known as "purse supplements." These are additional amounts paid to owners and breeders of Iowa-bred horses that finish in first through fourth place.[3] As the term "supplement" implies, these supplement purses are in addition to other purses that the horses might win. Suppose that, in a particular race, a non-Iowa-bred horse takes first and an Iowa-bred horse takes second place. The non-Iowa-bred horse would take the base purse that had been designated for the first-place winner. The Iowa-bred horse would win both the base purse designated for the second-place winner and a supplement purse designated for Iowa-bred horses.[4]

Before the start of the racing season (which generally runs from May to September), Prairie Meadows enters into a contract that governs the terms of racing during that year's season. Consistent with the statutory scheme, Prairie Meadows enters these contracts with Iowa HBPA—whom the contracts describe as "the representative entity for all horsemen racing at" Prairie Meadows. Also

---

[3]The amounts paid to breeders are also referred to as "breeder's awards." For our purposes, we will use the term "purse supplements" to describe the amounts paid to both owners and breeders of Iowa-bred horses.

[4]There are also races limited to Iowa-bred horses. There, the owner of each placing horse receives both a base purse and a supplement.

consistent with the statutory scheme, the contracts are subject to approval by the IRGC.

Through these contracts, Prairie Meadows and the Iowa HBPA determine (subject to IRGC approval) the total amounts that Prairie Meadows will set aside for thoroughbred racing for the season. For instance, in March 2010, Prairie Meadows and the Iowa HBPA entered a contract governing the 2010–2014 seasons. In it, Prairie Meadows and the Iowa HBPA agreed that the annual "total purses (including supplements)" for thoroughbred horses would be 83% of "11% of the first $200 Million of net receipts" and "6% of the net receipts above $200 Million." Similar terms appear in the January 2015 contract that governed the 2015–2019 seasons.

The contracts also address how these amounts should be divided between base purses—which any horse can win—and supplements—which are designated for Iowa-bred horses. According to the 2015 IRGC meeting minutes, "for approximately 25 years" the supplement for Iowa-bred-horses had been calculated using the "Rasmussen formula." The Rasmussen formula was the product of an agreement between Jim Rasmussen, who represented Prairie Meadows; Dick Clark, who represented the Iowa HBPA; and Gary Lucas, who represented the Iowa Thoroughbred Breeders and Owners Association (ITBOA). ITBOA is a nonprofit organization responsible for promoting the breeding and racing of thoroughbreds in Iowa. In 2020, ITBOA represented "400+ Iowa-bred thoroughbred owners and breeders." It is the largest association that represents this group.

Under the Rasmussen formula, the purse supplement amount is set at 20% of the "net purse amount," that is, 20% of the purses available to all horses. For example, the 2004 and 2005 contracts called for "total purses (including supplements) of $15 million." This total was allocated between $2,500,000 for purse supplements and $12,500,000 for base purses, that is, purses that any horse could win. Thus the net purse amount (the total of base purses) was equal to the total purse money divided by 1.2. As the contracts put it:

```
Calculation:
Net Purse Amount (Total Purses divided by 1.2)          12,500,000
Supplement (20% of Net Purse Amount)                     2,500,000
Total                                                    15,000,000
```

Similarly, the 2006 contract stated that "20% of the net purse amount allocated for Thoroughbred Horses (the gross Thoroughbred Horse purse amount divided by 1.20) shall be supplemented to Iowa bred horses placing in first through fourth positions, but capped at a maximum of $50,000 per race." Similar language appears in the contracts for 2007, 2008, and 2009.

As mentioned, in 2010, Prairie Meadows and the Iowa HBPA entered into a five-year agreement for the 2010–2014 seasons. It said: "20% of the net purse amount allocated for Thoroughbred Horses each year shall be supplemented to Iowa-bred horses placing in first through fourth positions, but capped at a maximum of $50,000 per race." Similar language appears in the 2015–2019 contract.

During the 2010 contract negotiations, there were disputes over a variety of issues. To avoid future disputes, the Iowa HBPA and others asked the 2011

legislature to codify the practice of allocating purse supplements. That spring, the legislature enacted Iowa Code section 99D.22, which states, in part:

> No less than twenty percent of all net purse moneys distributed to each breed, as described in section 99D.7, subsection 5, paragraph "*b*", shall be designated for registered Iowa-bred foals in the form of breeder's awards or purse supplement awards to enhance and foster the growth of the horse breeding industry.

Iowa Code § 99D.22(1)(*c*).

Prairie Meadows and the Iowa HBPA believed that, through this statute, the legislature had enacted their existing contractual practice—the Rasmussen formula. But some ITBOA members were not satisfied with this approach. They thought purse supplements should be calculated as 20% of the total purse amount allocated to thoroughbreds. To illustrate the difference: under the Rasmussen formula, if the total purse amount was $15,000,000, then the amount of money available to all horses would be $12,500,000, and the purse supplement would be 20% of $12,500,000, or $2,500,000. Under the alternative approach, if the total purse amount was $15,000,000, then the amount available to all horses would be $12,000,000, and the purse supplement would be $3,000,000, that is, 20% of $15,000,000. Either way, Prairie Meadows pays $15,000,000. The difference is how the money is disbursed.

In November 2014, the ITBOA filed a petition for declaratory order with the IRGC. The ITBOA asked the IRGC to declare that this alternative approach was required by the newly-enacted statute. Significantly, though, the ITBOA did not ask the IRGC to make its order retroactive to 2014, 2013, 2012, or any prior season. Nor did ITBOA ask for the alternative formula to apply in the 2015

season. Instead, ITBOA asked for it to "take effect January 1, 2016." In other words, ITBOA asked for the alternative formula to first take effect in the 2016 racing season.

The Iowa HBPA intervened. It argued for continued adherence to the Rasmussen formula.

Following a hearing in January 2015, the IRGC issued a declaratory order. The IRGC acknowledged that "for the last twenty-plus years," Prairie Meadows had calculated purse supplements for Iowa-bred horses according to the Rasmussen formula. The IRGC also noted that the proper reading of the new statute was "concededly a close question." Ultimately, though, the IRGC concluded that the statute required the use of ITBOA's proposed formula. However, "to avoid any disruptions during the 2015 meet and in order to best protect all parties' interests," the IRGC stayed its order "until November 1, 2015"—i.e., after the 2015 meet concluded. So, under the IRGC order, the new calculation would not take effect until the 2016 meet. Prairie Meadows could continue to use the Rasmussen formula for the 2015 meet.

Over three years later, in December 2018, Benda commenced this action against Prairie Meadows.[5] Benda claimed that he "is a breeder and owner of Iowa-foaled horses that performed well enough in races at Prairie Meadows from 2012–2015 that Benda was entitled to breeder's awards and purse supplements in each year." Benda asserted "a class-wide claim to correct" what he

---

[5]In October 2019, Benda filed his first amended petition, the relevant pleading for purposes of this appeal.

characterized as "a blatant miscalculation of awards due from Prairie Meadows to Iowa horse breeders and owners." Specifically, Benda alleged that Prairie Meadows had illegally used the Rasmussen formula during the proposed class period of 2012 through 2015.[6] Benda claimed that this improper approach had resulted in an underpayment of $1.8 million.

Benda asserted claims for unjust enrichment (count I), breach of implied contract (count II), breach of written contract (count III), breach of statutory duty (count IV), and declaratory relief (count V). Four of these five claims were based on alleged breaches of statutory duties.[7] One of Benda's claims—count III—was a third-party beneficiary claim based on the written contracts between Prairie Meadows and the Iowa HBPA. As relief, Benda requested "certification of this action as a class action" and "a judgment against Prairie Meadows . . . in an amount sufficient to fully compensate the Plaintiff and the other Class Members

---

[6]The amended petition explains:

Rather than multiplying the net purse moneys for thoroughbreds and quarter horses by 0.2 to determine the minimum amount it had to pay under section 99D.22, Prairie Meadows erroneously first divided the net purse by 1.2 and then multiplied the quotient by 0.2. This miscalculation was used to determine the amount of money deposited in a fund that was used to pay purse supplements.

. . . The difference between what Prairie Meadows should have paid in breeder's awards and purse supplements (according to Iowa Code § 99D.22(1)(c), the written agreements with the IAHBPA, and the data that Prairie Meadows reported to the IRGC) and Prairie Meadows' actual distributions in the form of breeders awards and purse supplements was over $1.8 million from 2012–2015.

[7]Count I alleged Prairie Meadows had been unjustly "enriched" through "racing activity that was premised on the statutory framework for purse supplements and breeder's awards." Count II alleged an implied contract that "it would distribute purses in accordance with applicable Iowa law." Count IV alleged "Prairie Meadows violated its statutory obligations and duties to Plaintiff under the plain terms set forth in Iowa Code Chapter 99D and all related sections of the Iowa Code." Count V sought a declaration that plaintiff "is a beneficiary entitled to purse supplements and breeder's awards under Iowa Code Chapter 99D and all related sections of the Iowa Code."

for the underpayment of Iowa breeder's awards and purse supplements from 2012–2015, plus interest and attorney's fees."

Prairie Meadows answered and asserted affirmative defenses. Among other things, Prairie Meadows asserted that it "is not a proper party in this action because it received no benefit from" any erroneous division of purses.

Iowa HBPA filed a motion to intervene and an answer. Iowa HBPA emphasized that Benda's lawsuit was premised on contracts between Iowa HBPA and Prairie Meadows. And, according to Iowa HBPA, "there was no breach of the Prairie Meadows/Iowa HBPA contracts." Iowa HBPA asserted that "Benda's claims should be dismissed and his request to certify a class denied."

The district court granted Iowa HBPA's motion to intervene. Soon after, Iowa HBPA filed a motion for summary judgment, which Prairie Meadows joined.

While the summary judgment motion was pending, Benda filed a motion for class certification. He described the proposed class as "[a]ll horse breeders or owners who were eligible to receive . . . supplement awards from Prairie Meadows for one or more Iowa-foaled horses . . . from 2012–2015."

ITBOA then moved to intervene. With its motion, ITBOA filed a resolution of its board of directors. Here are some excerpts from the resolution:

> WHEREAS, the Board has been advised by counsel on Benda's claims and the relief requested in the lawsuit, and
>
> WHEREAS, ITBOA's members would be potential members of the class action proposed by Benda, and
>
> WHEREAS, Benda's requested relief would damage Iowa's racing industry, and would be contrary to the interests of ITBOA's members, and

WHEREAS, Benda's requested relief, and his attorney's request for fees, are not in the best interest of Iowa-bred owners and breeders, and

WHEREAS, neither Benda nor his counsel can or should represent the interests of Iowa-bred owners and breeders, because IRGC revoked Benda's license to race horses in Iowa, and

WHEREAS, the ITBOA, as representative of its 400+ members who would be affected by this lawsuit, should be allowed to intervene in Benda's lawsuit . . . .

ITBOA, Iowa HBPA, and Prairie Meadows all resisted Benda's motion for class certification. Each presented supporting evidence. For instance, Iowa HBPA presented an affidavit from William Gessmann, who served as president of Iowa HBPA from 2002 to 2017. During that time, Gessmann "led the contract negotiations with Prairie Meadows on behalf of the Iowa HBPA." In particular, Gessmann "represented the Iowa HBPA in negotiating and signing" the 2010–2014 and 2015–2019 contracts at issue in this case. In Gessmann's view, Prairie Meadows had "allocated funds to purse supplements consistent with the Iowa HBPA's intent." "I do not agree that Prairie Meadows breached the Iowa HBPA contract as alleged by Benda," Gessmann added.

Meanwhile, the district court ruled on the pending summary judgment motion. The court concluded that because section 99D.22(1)(*c*) creates no private cause of action, Benda's claim for breach of statutory duty (count IV) must be dismissed. Likewise, the court reasoned, Benda cannot bring any other claims that rely on section 99D.22(1)(*c*) "to create a common law duty." Accordingly, the court dismissed Benda's claims for unjust enrichment (count I), breach of implied contract (count II), and declaratory relief (count V). But the court

declined to dismiss Benda's claim for breach of the written contracts. The court believed that the agreements between Prairie Meadows and the Iowa HBPA created contractual duties that were independent of the statute.

Soon after, the district court heard the motion for class certification. Ultimately, the court entered an order denying certification. Benda appealed under Iowa Rule of Civil Procedure 1.264(3), which permits an immediate appeal as of right from "[a]n order certifying or refusing to certify an action as a class action."

## II. Standard of Review.

As noted, "[o]ur review of the district court's ruling granting or denying certification of a class is limited because the district court enjoys broad discretion in the certification of class action lawsuits." *Freeman*, 895 N.W.2d at 113 (quoting *Legg*, 873 N.W.2d at 758). We adopt a district court's findings if "there is any reasonable basis in the record to support" them. *Comes*, 696 N.W.2d at 326 (citing *Stone v. Pirelli Armstrong Tire Corp.*, 497 N.W.2d 843, 846–49 (Iowa 1993)). "Reversal is appropriate only if the record reveals that the district court's decision was based on clearly untenable or unreasonable grounds." *Stone*, 497 N.W.2d at 845.

## III. Analysis.

**A. Introduction.** Class actions are governed by Iowa Rules of Civil Procedure 1.261 through 1.279. As the district court properly observed, "[o]ur class-action rules are remedial in nature and should be liberally construed to favor the maintenance of class actions." *Comes*, 696 N.W.2d at 320.

Under our rules, a class may be certified

> if four requirements are met: (1) the class is so numerous or so constituted that joinder is impracticable; (2) a common question of law or fact exists; (3) the action should be certified as a class action for 'fair and efficient adjudication of the controversy'; and (4) the representative parties will protect the interests of the class fairly and adequately.

*Iowa Ann. Conf. of United Methodist Church v. Bringle*, 409 N.W.2d 471, 474 (Iowa 1987); Iowa R. Civ. P. 1.262(2) (permitting certification if the district court "finds all of the following:" (1) "[t]he requirements of rule 1.261 have been satisfied," (2) "[a] class action should be permitted for the fair and efficient adjudication of the controversy," and (3) "[t]he representative parties fairly and adequately will protect the interests of the class"); *see id.* r. 1.261(1)–(2) (requiring (1) the class to be "so numerous or so constituted that joinder of all members, whether or not otherwise required or permitted, is impracticable" and (2) "a question of law or fact common to the class").

"The plaintiff has the burden of establishing that a purported class of plaintiffs meets the prerequisites." *Vos v. Farm Bureau Life Ins.*, 667 N.W.2d 36, 45 (Iowa 2003). "A failure of proof on any one of the prerequisites is fatal to class certification." *Id.*

In this case, the district court did not find that any of the prerequisites had been met. Its order focused on two concerns. First, the court rejected the notion that class certification would advance the "fair and efficient adjudication of the controversy," as rule 1.262(2)(*b*) requires. Iowa R. Civ. P. 1.262(2)(*b*). Second, the court found "Benda is not an adequate representative party to protect the interests of the purported class members," as rule 1.262(2)(*c*)

requires. *Id.* r. 1.262(2)(*c*). Because we conclude that the question of adequate representation is dispositive, we focus on it. *See Stone*, 497 N.W.2d at 846 (concluding district court did not abuse its discretion in denying class certification solely on basis of adequacy of representation).

**B. Fair and Adequate Representation.** Under rule 1.262(2)(c), a class may not be certified unless the class representative will "fairly and adequately . . . protect the interests of the class." Iowa R. Civ. P. 1.262(2)(*c*). We have said that "adequacy of representation is perhaps the most significant of the prerequisites to a determination of class certification." *Stone*, 497 N.W.2d at 846 (quoting *Folding Cartons, Inc. v. Am. Can Co.*, 79 F.R.D. 698, 701 (N.D. Ill. 1978)); *see also Rattray v. Woodbury County*, 614 F.3d 831, 835 (8th Cir. 2010) ("The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action.").

A district court may not conclude that "the representative parties fairly and adequately will protect the interests of the class" unless the court

find[s] all of the following:

> *a.* The attorney for the representative parties will adequately represent the interests of the class.
>
> *b.* The representative parties do not have a conflict of interest in the maintenance of the class action.
>
> *c.* The representative parties have or can acquire adequate financial resources, considering rule 1.276, to ensure that the interests of the class will not be harmed.

Iowa R. Civ. P. 1.263(2).

When considering the adequacy of representation, "each case must be judged on its own facts." *Stone*, 497 N.W.2d at 847. "Resolution of the issue depends on all the circumstances presented." *Id.* "When a court denies class action certification on the basis of inadequate representation there are usually special circumstances or a combination of factors involved." *Id.*

That is true here. Under the particular circumstances of this highly unusual case, we find no abuse of discretion in the district court's determination that Benda is not an appropriate class representative. Rather, we see multiple areas of conflict between Benda and the interests of potential class members.

First, as explained, Benda's proposed class action is opposed by the Iowa HBPA, which represents over 1,100 horsemen who run thoroughbreds at Prairie Meadows. Indeed, under both state and federal law, the Iowa HBPA is the legally designated representative of horsemen for purposes of bargaining and signing purse agreements with Prairie Meadows. And the very contracts on which this case relies were negotiated by and entered into by the Iowa HBPA. But Iowa HBPA does not believe Prairie Meadows breached the contracts. As part of its opposition to class certification, Iowa HBPA filed an affidavit from William Gessmann, a former president of the Iowa HBPA who actually negotiated the contracts at issue in this case. Gessmann testified that "Prairie Meadows allocated funds to purse supplements consistent with the Iowa HBPA's intent."

There's more. Although the core premise of Benda's suit is that Prairie Meadows breached by following the Rasmussen formula, the Iowa HBPA believes

the opposite is true.[8] The Iowa HBPA notes that it "indisputably wanted and urged Prairie Meadows to perform the contract using the Rasmussen formula." This is not a brand-new position that Iowa HBPA manufactured in response to Benda's current suit. Back in 2015—three years before Benda's lawsuit—the Iowa HBPA litigated before the IRGC about the proper allocation of purse money and supplements. The record from those 2015 proceedings makes it clear that—in Iowa HBPA's view—the Rasmussen formula was the right way for Prairie Meadows to distribute purse money. And that view is, of course, the opposite of Benda's theory in this case.

That's not all. Even if the Iowa HBPA agreed with Benda's view of the merits, it would still think that this class action is a bad idea. Iowa HBPA explains that horseracing requires "the coordination of owners, trainers, breeders, and—obviously—Prairie Meadows." They must work "together for the common good of the entire industry." But "[s]uing Prairie Meadows for over $2 million," as Benda proposes, would "hurt[] Prairie Meadows, who is a partner in promoting the horseracing industry in Iowa." And so, Iowa HBPA and its members "have an interest in opposing this lawsuit, regardless of the merits."

Iowa HBPA is not alone in resisting this suit. As noted, although Iowa HBPA is the statutorily designated representative of the horsemen and—indeed—the promisee for the contracts on which Benda's case is based, there is another

---

[8]In his reply brief, Benda argues that even if the Rasmussen formula is the proper calculation, Prairie Meadows still did not follow the formula correctly and, therefore, underpaid purse supplements. Even if this is true, we do not believe it resolves the important conflicts present here. For one thing, it doesn't resolve the conflict over whether the Rasmussen formula should apply. Also, as will be explained, it doesn't resolve the conflict over appropriate remedies.

important group that represents horsemen who race at Prairie Meadows. That group is ITBOA, a 400+ member organization that represents "Iowa-bred thoroughbred owners and breeders." Because of ITBOA's focus on Iowa-bred horses, "ITBOA's members would be potential members of the class action proposed by Benda." But ITBOA agrees with Iowa HBPA that the class action is a bad idea. ITBOA thinks that "Benda's requested relief would damage Iowa's racing industry, and would be contrary to the interests of ITBOA's members."

In short, Benda's suit faces substantial resistance. As Iowa HBPA observes, "it may be unprecedented" that "two groups who already represent virtually every proposed class member have intervened to say that this case should be dismissed and class certification denied." This is particularly striking because Benda has not countered by identifying any group of potential class members—not even just a handful—who support the case. The one potential class member who has given support to the suit appears to have based her position on her knowledge and trust of Benda's attorneys. She admitted that she hadn't "gotten into the merits" of the case and didn't know whether Benda would adequately represent the interests of all of the potential class members.

In Benda's view, though, the opposition he faces here is no different from that in *Kragnes v. City of Des Moines*, 810 N.W.2d 492, 498 (Iowa 2012). In *Kragnes*, we concluded that—although some class members opposed the class action—there was "no fundamental conflict among the class members" as to whether the defendant city had collected fees illegally. *Id.* at 500. Here, though, there *are* fundamental conflicts as to whether Prairie Meadows did anything

wrong. Both ITBOA and Iowa HBPA hold the position that Benda's suit "has no merit." And Iowa HPBA believes Prairie Meadows made *appropriate* payments from 2012 through 2015. That's a fundamental conflict about the central merits issue in this case, namely: Did Prairie Meadows breach the contracts by failing to make appropriate payments from 2012 through 2015?

There are other problems, too. As the district court noted, the IRGC has revoked Benda's license to race horses in Iowa.[9] ITBOA believes this means that Benda "neither . . . can [n]or should represent the interests of Iowa-bred owners and breeders." Others have expressed similar views. And our cases acknowledge that "[t]he stature of the purported class representative is a legitimate area of inquiry." *Stone*, 497 N.W.2d at 847.

But we are much more troubled by a different aspect of Benda's license situation. The contracts on which Benda's suit depends include a clause that dictates the remedy for underpayment of purses or supplements. It provides that "[a]ny underpaid purses or supplements" from prior years must be "set aside solely to enhance purses and supplements" in future years. Benda doesn't want this remedy because—unlike many possible class members—Benda is no longer racing at Prairie Meadows. In his deposition, Benda was asked about the possibility of requiring Prairie Meadows to pay out the alleged underpayment through future purse supplements. Benda responded: "Well, that would be unfair to the owners in 2012 to '15 that no longer are participating. How do they

---

[9]In his reply brief, Benda points out that horses that he bred in Iowa are still racing at Prairie Meadows. However, we do not believe this resolves the conflicts we have described.

recover -- how do they recover? Such in a specific instance myself. *I'm not racing.*" (Emphasis added.).

According to Benda's own testimony, then, the remedy prescribed in the contracts is not a remedy that would benefit Benda—although it might benefit other class members who still race at Prairie Meadows. This shows that Benda has a conflict with class members that is "fundamental, going to the specific issues and controversies." *Vignaroli v. Blue Cross of Iowa*, 360 N.W.2d 741, 746 (Iowa 1985). And it shows Benda has a "conflict of interest in the maintenance of the class action" for purposes of rule 1.263(2)(*b*). Iowa R. Civ. P. 1.263(2)(*b*); *Stone*, 497 N.W.2d at 848 (holding the district court could properly consider a conflict between the potential class representative, who no longer worked for defendant-employer, and potential class members who remain as employees). This alone shows denial of certification was not an abuse of the district court's "broad discretion." *Kragnes*, 810 N.W.2d at 503 ("[T]he applicable standard of review accords broad discretion to the district court . . . .").

We have considered all of Benda's counterarguments. For example, we note Benda's suggestion that "Iowa's class action rules do not permit an inquiry into the merits of class action claims for relief." We think the analysis is somewhat more nuanced. Certainly, we agree that class certification doesn't depend "on a determination of whether the plaintiffs will ultimately prevail on the merits." *Vos*, 667 N.W.2d at 45. This doesn't mean, though, "that the court may not require sufficient information to form a reasonable judgment in deciding whether to certify a class action." *Id.* at 46 (quoting *Martin v. Amana*

*Refrigeration, Inc.*, 435 N.W.2d 364, 367–68 (Iowa 1989)). Indeed, "[b]ecause 'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" the class certification "analysis often requires the court 'to probe behind the pleadings before coming to rest on the certification question.'" *Id.* (quoting *Cohn v. Mass. Mut. Life Ins.*, 189 F.R.D. 209, 212 (D. Conn. 1999)). That is true here. As explained, the question of adequate representation is interlaced with possible remedies available to the class as well as the basic question of whether Prairie Meadows breached the contracts.

Benda makes other points that are worthwhile. For instance, Benda suggests that the district court placed too much emphasis on Benda's various legal and financial problems, including alleged impropriety by Benda in connection with horseracing. The district court believed that these various problems would impact Benda's credibility and, therefore, "make his representation less effective." As to the specific question of credibility, we disagree with the district court. As we confirmed with counsel at oral arguments, it is unlikely that Benda would even have to testify at a trial of this matter. And so his credibility as a witness is not especially relevant. Moreover, because Benda is represented by highly-skilled attorneys who are fronting the costs of this litigation, Benda's financial problems haven't and wouldn't undermine his ability to advance the litigation.

All the same, though, Benda's problems are not irrelevant. As noted, they impact Benda's stature. Much more importantly, though, Benda's problems have

led to him losing his license to race horses. They make it unlikely that he will race at Prairie Meadows again. And that creates fundamental conflicts between Benda and horsemen he wants to represent.

### III. Conclusion.

As we emphasized in *Kragnes*, "the applicable standard of review accords broad discretion to the district court" in determining whether conflicts preclude class certification. *Kragnes*, 810 N.W.2d at 503. Applying this deferential standard of review to the unusual facts of this particular case, we find no abuse of discretion in the district court's determination that certification is inappropriate. We affirm.

### AFFIRMED.

Christensen, C.J., and McDonald and Oxley, JJ., join this opinion. Mansfield, J., files a dissenting opinion, in which Waterman, J., joins. McDermott, J., takes no part.

#21–0649, *Benda v. Prairie Meadows Racetrack and Casino, Inc.*

**MANSFIELD, Justice (dissenting).**

I respectfully dissent.

**I. Class Representation Is Adequate.**

In my view, Robert Benda is an adequate class representative under Iowa Rule of Civil Procedure 1.263(2). His claim is a third-party beneficiary claim for breach of contract; Benda alleges misapplication of a mathematical payment formula. As the majority notes, "[I]t is unlikely that Benda would even have to testify at a trial of this matter." Benda is represented by capable class action counsel who are fronting the costs of litigation. Benda's licensure status and other legal or financial problems are irrelevant to the contract interpretation issues at the heart of this case.

Benda may have had past conflicts with the Iowa Horsemen's Benevolent and Protective Association (Iowa HBPA) and Prairie Meadows, but rule 1.263(2) requires only that he not have "a conflict of interest *in the maintenance of the class action.*" Iowa R. Civ. P. 1.263(2)(*b*) (emphasis added). There is no showing that Benda is conflicted in that sense. He will be financially better off if this lawsuit is successful, and the defendants do not point to any reason why he would not be motivated to pursue it.

The majority really is advancing several *other* reasons why a class should not be certified. The district court did not rely on these reasons. I do not find any of them persuasive or supported by our class action rules.

**II. The Opposition of the Iowa HBPA Is Not a Reason for Denying Certification; They Have a Conflict of Interest.**

One reason is that the Iowa HBPA opposes Benda's suit. That's not surprising. The Iowa HBPA negotiated the contract on which Benda is suing. If Benda has a claim, that means the Iowa HBPA neither negotiated nor administered the contract correctly. So the Iowa HBPA is not a disinterested party. If anybody has a conflict of interest, it is the Iowa HBPA. The Iowa HBPA's opposition is not a reason for denying class certification.

**III. The Opposition of Some Class Members Is Not a Reason for Denying Certification.**

Nor is the opposition of some class members a reason for denying class certification. Neither the Iowa HBPA nor the Iowa Thoroughbred Breeders and Owners Association (ITBOA) surveyed their members. Many might support the lawsuit if they saw the prospect of receiving cash payments. Nonetheless, I accept for purposes of discussion that some class members are opposed to Benda's lawsuit. That is not enough to defeat class certification. *See Kragnes v. City of Des Moines*, 810 N.W.2d 492, 500 (Iowa 2012); *Vignaroli v. Blue Cross of Iowa*, 360 N.W.2d 741, 746–47 (Iowa 1985). In any securities class action, various insiders will have large holdings of stock in the corporation and will be opposed to class certification. Do they get a veto? Of course not. The situation may be similar here.

**IV. The Record Indicates That Prairie Meadows Can Pay a Judgment; Any Decision to Pursue Prior Overpayments Would Be That of Prairie Meadows.**

The reasons given by the Iowa HBPA and the ITBOA for not allowing this litigation against Prairie Meadows to go forward—even if the claim has legal merit—are also unpersuasive. A successful lawsuit would "hurt" Prairie Meadows only in the sense that paying a casino jackpot hurts Prairie Meadows. The record shows that Prairie Meadows generates a "casino net win" of approximately $200,000,000 per year. That is more than enough to pay a verdict in this case.

I also doubt that anyone other than Prairie Meadows would end up paying any part of a verdict or settlement in this case. If Prairie Meadows decides to pursue owners and breeders who received prior overpayments in good faith, that would be a decision attributable to Prairie Meadows, not anyone else.

Note that we affirmed class certification in *Kragnes v. City of Des Moines* even though the defendant there was not a racetrack and casino earning $200,000,000 a year but a city being ordered to pay "roughly $40 million" to its residents. 810 N.W.2d at 498, 515. This was a much clearer case of class members being forced to fund their own successful class action, including the attorney fees for the class counsel. *See id.* at 496. True, the city's residents were to receive tax refunds, but the residents would end up paying for those refunds (plus attorney fees) through whatever financing mechanism the city used. *Id.* at 502–03.

**V. The Contract Does Not Defeat Benda's Class Claim.**

Finally, the majority contends that Benda's third-party beneficiary breach of contract claim will fail on the merits. The majority points to a contract clause relating to "Underpaid Purses." The majority doesn't actually quote the clause, and I believe a quotation from the contract shows that the clause is plainly inapplicable:

> Underpaid Purses From Prior Years. To the extent that PRAIRIE MEADOWS has not fully distributed all net purse money or purse supplements for Thoroughbred Horses from prior years, such underpaid funds shall be segregated and set aside by PRAIRIE MEADOWS in a separate interest bearing account (the "Account") for Thoroughbred Horse racing at PRAIRIE MEADOWS, the principal of which shall be paid in purses and/or supplements for Thoroughbred Horse racing at PRAIRIE MEADOWS in subsequent years.[10]

To my reading, this paragraph deals with the situation where Prairie Meadows has leftover purse and purse supplement money that "has not [been] fully distributed." Such funds go into an escrow to enhance future purses and supplements. That's not the situation here. Prairie Meadows doesn't have leftover money; it is alleged to have paid out according to the wrong formula. Iowa HBPA's executive director confirmed that this "underpayment account" has no connection to the purse supplements for Iowa horses.

Normally, "we decline to 'engage in free-ranging merits inquiries at the certification stage.' " *Freeman v. Grain Processing Corp.*, 895 N.W.2d 105, 120 (Iowa 2017) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

---

[10]The quotation is from the 2015 contract. The same wording appears in the 2010 contract except the phrase "all allotted purses" is used instead of "all net purse money or purse supplements."

466 (2013)). "The merits should be analyzed only to the extent relevant in determining whether the rules have been satisfied." *Id.* But even if we were to make an exception to this practice and examine the merits here, I'm not persuaded that the "Underpaid Purses From Prior Years" clause provides a defense.

I would also note that Benda's third-party beneficiary breach of contract claim has already been through the summary-judgment wringer and emerged unscathed. The defendants did not raise this particular clause as a reason for granting summary judgment.

### VI. This Case Is Well Suited for Class Adjudication.

Our cases emphasize that "the proponent's burden is light" to establish the grounds for class certification. *Freeman*, 895 N.W.2d at 114 (quoting *City of Dubuque v. Iowa Tr.*, 519 N.W.2d 786, 791 (Iowa 1994)). Benda met that light burden. As the majority acknowledges, "[t]he class action rules should be 'liberally construed and the policy should favor maintenance of class actions.' " *Id.* (quoting *Lucas v. Pioneer, Inc.*, 256 N.W.2d 167, 176 (Iowa 1977) (en banc)). "A key factor is whether 'common questions of law or fact predominate over any questions affecting only individual members.' " *Id.* at 115 (quoting Iowa R. Civ. P. 1.263(1)(*e*)). That key factor is met here. All several hundred class members are in the same boat: their claims rise or fall based on resolution of the disputed formula. If Benda's interpretation prevails, the class members all were underpaid and the individual recoveries will be based on simple math. That common question—which payout formula governs—predominates over individual issues.

Importantly, the amount of each individual claim is probably too small to justify individual lawsuits. These claims will be heard, if at all, as a group. As we reiterated in *Freeman v. Grain Processing Corp.*, the goal of our class action rules is the

> efficient resolution of the claims or liabilities of many individuals in a single action, the elimination of repetitious litigation and possibly inconsistent adjudications involving common questions, related events, or requests for similar relief, and the establishment of an effective procedure for those whose economic position is such that it is unrealistic to expect them to seek to vindicate their rights in separate lawsuits.

*Id.* at 114 (quoting *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 320 (Iowa 2005)). That goal is thwarted by today's majority opinion, which leaves the putative class members without a meaningful remedy.

**VII. Conclusion.**

For all these reasons, I would reverse the district court's order denying class certification and remand for further proceedings. Of course, nothing is permanent, least of all class action certification. Based on later developments, a class can be decertified. *Freeman*, 895 N.W.2d at 119–20. For example, if it turns out that Benda is truly alone on his own island and that no one else in the class wants the case to go forward, decertification could be ordered for lack of numerosity. Benda could then pursue his own individual claim. That's not the state of the record here.

Waterman, J., joins this dissent.